## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 29 2020, 12:22 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEY FOR APPELLEE

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Garrett Andrew Plumlee, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | May 29, 2020 <br><br> Court of Appeals Case No. 19A-CR-2553 <br><br> Appeal from the Vanderburgh Circuit Court <br><br> The Honorable David D. Kiely, Judge <br><br> The Honorable Gary J. Schutte, Magistrte <br><br> Trial Court Cause No. 82C01-1905-F2-3303 |

**Altice, Judge.**

# Case Summary

[1] Garrett Plumlee appeals his convictions for two counts of possession of a handgun by a serious violent felon, a Level 4 felony, claiming that the trial court erred in admitting two handguns into evidence because his rights were violated under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Plumlee argues that police officers unlawfully seized him and conducted a warrantless search of a vehicle that led to the discovery of the guns. Plumlee also asserts that his convictions must be reversed because the verdict forms submitted to the jury "eliminated the presumption of innocence." *Appellant's Brief at* 5.

[2] We affirm.

# Facts and Procedural History

[3] On May 9, 2019, Evansville police officers Christopher Seibert and James Beard responded to a 911 call regarding two occupants who had been passed out in a running vehicle that was parked on a city street for nearly an hour. Neither the caller nor his neighbors recognized the occupants or the vehicle. The officers were concerned that the occupants were in distress because there had been a heroin overdose call in the same area in the preceding hour.

[4] When the officers arrived at the scene, Officer Beard requested dispatch to check the license plate on the vehicle. The dispatcher responded that the license plates were "fictitious." *Transcript Vol. II* at 168. As the officers approached the vehicle, they observed two men asleep or passed out with the seats fully reclined. They also noticed what appeared to be a large amount of cash sitting on the console. Officer Seibert knocked on one of the windows to rouse the occupants. When the men first awoke, they began "moving around a lot in the vehicle." *Id.* at 151. Brandon White was identified as the driver, and Officer Seibert recognized Plumlee, the passenger, as a felon who was known to carry firearms and use drugs.

[5] Concerned for the safety of themselves and the occupants, the officers retreated to the rear of the vehicle and radioed for backup assistance. Thereafter, Officer Seibert repeatedly asked the men what they were doing and he specifically asked Plumlee if he was able to speak. Neither man responded, and as Plumlee was stepping out of the vehicle, Officer Seibert saw a Ruger handgun on Plumlee's seat. The officers escorted Plumlee away from the vehicle and handcuffed him while they searched the vehicle. During the search, Officer Beard located a second handgun "below the backseat." *Id.* at 175. The weapons were loaded and it was subsequently determined that Plumlee's DNA was on both guns.

[6] Plumlee was charged with two counts of possessing a firearm as a serious violent felon. At the jury trial that commenced on August 26, 2019, Plumlee proffered the following verdict forms:

We, the jury, find the Defendant, Garrett Andrew Plumlee, did knowingly or intentionally possess a firearm, to wit: a Taurus/Ruger handgun, on or about May 9, 2019.

. . . .

We, the jury, do not find that the Defendant, Garrett Andrew Plumlee, knowingly or intentionally possessed a firearm, to wit: a Taurus/Ruger handgun, on or about May 9, 2019.

*Appellant's Appendix Vol. II* at 105. The trial court rejected those forms in favor of the following

COUNT I
VERDICT

We, the jury, find the Defendant, Garrett Andrew Plumlee, did knowingly or intentionally possess a firearm, to wit: a Ruger handgun on or about May 9, 2019, in Count 1.

VERDICT

We, the jury, find the Defendant, Garrett Andrew Plumlee, did not knowingly or intentionally possess a firearm, to wit: a Ruger handgun, on or about May 9, 2019, in Count 1.

*Id.* at 127.

COUNT 2
VERDICT

We, the jury, find the Defendant, Garrett Andrew Plumlee, did knowingly or intentionally possess a firearm, to wit: a Taurus handgun, on or about May 9, 2019, in Count 2.

. . . .

<u>VERDICT</u>

We, the jury, find the Defendant, Garrett Andrew Plumlee, did not knowingly or intentionally possess a firearm, to wit: a Taurus handgun, on or about May 9, 2019, in Count 2.

*Id.* at 128.

[7] Plumlee was found guilty as charged, and he admitted to being both a serious violent felon and a habitual offender. Thereafter, the trial court sentenced Plumlee to eight years on each of the handgun charges. Those sentences were ordered to run concurrently and enhanced by ten years on the habitual offender count for an aggregate term of eighteen years. Plumlee now appeals.

# Discussion and Decision

## *I. Search and Seizure*

[8] Plumlee claims that the trial court erred in admitting the handguns into evidence because the encounter with the police officers amounted to an unlawful seizure and the subsequent search of the vehicle violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution.

[9] We generally review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Rogers v. State,* 130 N.E.3d 626, 629 (Ind. Ct. App. 2019). We will reverse a ruling on the admission of evidence for an abuse of discretion, which occurs only when the ruling is clearly against the

logic and effect of the facts and circumstances, and the error affects a party's substantial rights. *Clark v. State,* 994 N.E.2d 252, 260 (Ind. 2013). We will not reweigh the evidence and we will consider all conflicting evidence in favor of the lower court's ruling. *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015). The trial court's ruling may be sustained on any reasonable basis apparent in the record. *Jeter v. State*, 888 N.E.2d 1257, 1267 (Ind. 2008).

### A. The Fourth Amendment

[10] The Fourth Amendment to the United States Constitution provides in part that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." The purpose of the Fourth Amendment is to protect people from unreasonable search and seizure, and it applies to the States through the Fourteenth Amendment. *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). Hence, a warrantless search or seizure is presumptively unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State,* 63 N.E.3d 329, 331 (Ind. 2016).

[11] One of the exceptions to the warrant requirement is the emergency aid doctrine. In accordance with this exception, a police officer may act without a warrant where the officer had "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009); *M.O.*, 63 N.E.2d at 332. Emergency circumstances involving injury or imminent danger to a person's life justify governmental intrusion for the purpose of preventing further injury or aiding those injured. *M.O.,* 63

N.E.3d at 333. "[T]he test is objective, and the government must establish that the circumstances as they appear[ed] at the moment of [the stop] would lead a reasonable, experienced law enforcement officer to believe that someone inside the [vehicle] required immediate assistance." *Id.* at 334 (quoting *Trotter v. State,* 933 N.E.2d 572, 577 (Ind. Ct. App. 2010)). On the other hand, police officers "do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher,* 558 U.S. at 49, *see also Randall v. State,* 101 N.E.3d 831, 840 (Ind. Ct. App. 2018), *trans. denied.* Hence, it is not necessary for police to have a warrant to enter a place "when the facts suggest a reasonable belief that a person within the premises is in need of aid." *Stewart v. State,* 688 N.E.2d 1254, 1257 (Ind. 1997) (quoting *Geimer v. State,* 591 N.E.2d 1016, 1019 (Ind. 1992)).

[12] The circumstances here are akin to those presented in both *Cruz-Salazar v. State,* 63 N.E.3d 1055 (Ind. 2016), and *Randall.* In *Cruz-Salazar,* a police officer responded to a report of a running vehicle that had been parked in front of a residence for thirty minutes. When the officer arrived, he noticed that the defendant was either sleeping or passed out. Because the defendant did not respond to the officer's knock on one of the windows, the officer opened the car door to check on the defendant because he "didn't know why he was asleep, if there was a medical problem." *Cruz-Salazar,* 63 N.E.3d at 1055-56. When the defendant awoke, he showed signs of intoxication and admitted that he had been drinking. The defendant was arrested for public intoxication after

registering 0.184 on a portable breath test and during a search incident to the arrest, the defendant was found in possession of cocaine.

[13] In concluding that the police officer's warrantless entry into the vehicle was permissible under both the United States and Indiana Constitutions, our Supreme Court held that "the report of a stationary vehicle that had been running for thirty minutes, in the early hours of a cold December morning," was sufficient to merit further investigation, because those circumstances could "be an indicator of distress." *Id.* at 1056. The Court opined that "Cruz-Salazar was at the wheel of the vehicle and was not responsive when [the officer] both shined his flashlight through the windows *or* when he tapped on the window. At this point the officer had an objectively reasonable basis to open the door and check on Cruz-Salazar's well-being." *Id.* (Emphasis in original).

[14] In *Randall*, a hospital security officer observed the defendant sitting in a car in the facility's parking lot with the driver's door open and the ignition off. The officer pulled in behind the vehicle to conduct a welfare check because the defendant-driver appeared to be "slumped over" the steering wheel. *Randall*, 101 N.E.3d at 835. A few seconds later, the defendant suddenly exited the car and quickly walked toward the officer. After the defendant complied with the officer's directive to return to the vehicle, the officer approached the car and began conversing with the defendant. At some point, the officer noticed a folded square of aluminum foil on the dashboard. Suspecting that the foil pack was consistent with narcotics use, the officer asked the defendant: "[W]hat else in the vehicle he would not want a canine officer to find," and the defendant

responded that there was a marijuana pipe in the car. *Id.* The defendant was ordered from the vehicle and detained following a brief scuffle. Additional officers arrived, searched the vehicle, and discovered methamphetamine and two marijuana pipes. The defendant was arrested and charged with methamphetamine possession and possession of paraphernalia.

[15] Following the trial court's denial of the defendant's motion to suppress, the defendant sought interlocutory review by this court. We affirmed the trial court on the grounds that the seizure of the defendant was permissible under the emergency aid doctrine and determined that the officer's observations "could give rise to a reasonable concern that emergency medical assistance was needed, prompting further investigation." *Id.* at 840. Thus, we concluded that because the officer had an objectively reasonable basis to believe that the defendant needed medical assistance upon his initial observation of the vehicle, the brief seizure of the defendant was justified under the emergency aid exception to the warrant requirement. *Id.* at 840-41.

[16] Here, Plumlee and White were passed out or sleeping in a parked vehicle with the engine running for almost an hour, thus prompting a resident in the neighborhood to contact 911. As there had been a recent report of a drug overdose in the same area, the officers were concerned about their well-being. Moreover, one of the officers recognized Plumlee as a known drug user. When Officer Seibert knocked on one of the car windows, Plumlee began "moving around a lot in the vehicle." *Transcript Vol. II* at 151. Plumlee could not—or would not—respond to Officer Seibert's direct and repeated inquiries to him.

Officer Seibert noticed the handgun on the seat prior to having the opportunity to thoroughly inquire about the occupants' well-being or make any determination as to whether they were in danger and may have required medical attention. In our view, it was reasonable for the officers to ask Plumlee and White to exit the vehicle for officer safety, and the circumstances were sufficient to warrant further investigation so the officers could determine whether medical assistance was needed. *See Randall*, 101 N.E.3d at 840.

[17] That said, we reject Plumlee's claim that the result reached in *M.O.* and *Madison v. State*, 357 N.E.2d 911 (Ind. 1976) should control the outcome here. In *M.O.*, a gas station clerk called police and reported a woman "stuck underneath her vehicle in the parking lot." *M.O.,* 63 N.E.3d at 330. When the responding police officer arrived at the scene, the dispatcher had already advised the officer that the woman was leaving the gas station. As the officer observed the vehicle pulling away, he initiated a traffic stop because he "was concerned that [the driver] potentially could have been seriously injured. . . ." *Id.* During a verbal exchange, the defendant-driver explained to the officer that she had become "stuck" because her car "has a manual transmission, and she had neglected to engage her parking brake, causing it to roll backwards as she exited." *Id.* at 331. The defendant also stated that she was "fine" and declined an offer of medical care. *Id.* Although the officer did not observe any signs of physical injury, he continued to engage in conversation with the defendant and noticed signs of impairment and the odor of alcohol. *Id.*

The defendant was arrested and charged with operating a vehicle while intoxicated as a class A misdemeanor. The trial court denied the defendant's motion to suppress, and our Supreme Court reversed. The Court determined that the circumstances did not support the officer's concern for the defendant because he had learned that the defendant freed herself before he had arrived at the gas station, she operated her vehicle normally, and the officer had not witnessed any traffic infractions or criminal conduct. As a result, no exigency existed to sufficiently justify stopping the defendant's car. *Id.* at 333-34.

In *Madison*, the arresting officers were on routine patrol when they noticed the defendant's vehicle parked legally near a picnic area. The officers approached and found the defendant groggy and nearly asleep. The defendant immediately told the officers that he was "okay" and after being asked for identification, he exited the vehicle. At that point, the officers "noticed a belt buckle which appeared to be a hash pipe." 357 N.E.2d at 912. Upon looking into the vehicle, the officers observed bags of marijuana under both front visors. The defendant was arrested and convicted of possession of a controlled substance and possession of an instrument used in smoking a controlled substance.

In reversing the convictions, our Supreme Court determined that the circumstances did not warrant investigation beyond an inquiry into the defendant's well-being because the "only testimony offered . . . that Madison appeared 'half asleep' and 'groggy'. . . [did] not support a rational inference of criminal activity and . . . therefore, . . . the subsequent detention was unlawful." *Id.* at 913. The Court noted that "[w]e certainly cannot fault the officers for

approaching the parked car to see if everything was alright. However, once Madison replied that he was okay, the basis for the initial inquiry was satisfied and no further investigation was warranted." *Id.*

[21] Unlike the circumstances in *M.O.,* and *Madison,* Plumlee did not respond to the officers' inquiries about his well-being and the officers did not stop Plumlee's vehicle or otherwise restrict his movement when they approached him. Moreover, the defendants in *M.O.* and *Madison* acknowledged to the officer that they were fine and did not require medical assistance.

[22] In this case, it is apparent that the officers engaged Plumlee to discern whether medical assistance was needed and, as Plumlee exited the vehicle, Officer Seibert saw the handgun on the seat. Plumlee had not responded to Officer Seibert's inquiry about his well-being, and Officer Seibert was not able to determine whether either of the men needed medical assistance. Plumlee's apparent inability to answer supported a continued reasonable belief that emergency aid may have been required. The officers here took only the investigatory measures needed to determine whether Plumlee required help before they noticed the handgun on the seat; whereas in *Madison,* the police officers engaged in further investigation and found evidence of criminal activity only after the defendant indicated that he did not need assistance. *Madison*, 357 N.E.2d at 912.

[23] For these reasons, the holdings in *M.O.* and *Madison* do not demonstrate that the officers' actions here violated the Fourth Amendment. Thus, we conclude

that the officers' actions were justified under the emergency aid exception to the warrant requirement.

## B. *The Indiana Constitution*

In a separate argument, Plumlee claims that his right to be free from unreasonable search and seizure was violated under Article 1, Section 11 of the Indiana Constitution. While Article 1, Section 11 shares the same language as the Fourth Amendment, our courts have interpreted and applied the state protection independently. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). Rather than "focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, and employ a totality of the circumstances test to evaluate the reasonableness of the officer's actions." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010). This court affords Article 1, Section 11 "a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy." *Rush v. State*, 881 N.E.2d 46, 52 (Ind. Ct. App. 2008).

There are three non-exclusive factors that we regularly balance in determining whether police conduct was reasonable under the Indiana Constitution: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *M.O.*, 63 N.E.3d at 334 (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)). In analyzing the emergency aid exception, "the degree of concern, suspicion, or knowledge that a violation has occurred" should be analyzed in the context of

the "degree of concern that emergency medical assistance was needed." *Randall*, 101 N.E.3d at 841.

[26] In this case, Plumlee and White appeared to be unconscious for nearly an hour in a running vehicle that nearby residents did not recognize. The situation was concerning enough to prompt a 911 call from a neighborhood resident. Both officers believed that Plumlee and White may have suffered an overdose, particularly because a similar report was made only an hour before in the same area, and Plumlee was a known drug user. The evidence demonstrates that the officers had an objective reasonable concern in these circumstances that medical assistance may have been required. That degree of concern was high in this case.

[27] As for the second factor, the officers did not impede the movement of the vehicle or its occupants during their investigation. The vehicle was parked and Plumlee was asked to merely exit the vehicle as the officers were attempting to ascertain whether medical aid was needed. Hence, the degree of intrusion was minimal.

[28] Finally, we note that because the officers held a reasonable belief that the occupants of the vehicle could have been in distress and in need of medical care, the extent of law enforcement needs was high. Put another way, the officers were properly exercising their community-caretaking function in investigating the 911 report to assess whether Plumlee and the driver required help. Thus, when the high degree of concern and the extent of law enforcement

needs are balanced with the low level of intrusion, the officers' brief seizure of Plumlee was permissible under Article 1, Section 11 of the Indiana Constitution. Hence, we conclude that the admission of the handguns into evidence did not violate either the Fourth Amendment to the United States Constitution or Article 1, Section 11 of the Indiana Constitution.

## II. Verdict Forms

Plumlee claims that his convictions must be reversed because the trial court's verdict forms negated his presumption of innocence. Plumlee maintains that the verdict forms were "constitutionally infirm" because they erroneously instructed the jury that he was required to prove his innocence, thus "flipping the presumption of innocence on its head." *Appellant's Brief* at 23.

Verdict forms are essentially instructions to the jury and those forms are reviewed under the same abuse of discretion standard that applies to jury instructions. *Fox v. State*, 497 N.E.2d 221, 224-25 (Ind. 1986). Thus, verdict forms are reviewed in conjunction with the jury instructions as a whole. *Knapp v. State*, 9 N.E.3d 1274, 1284-85 (Ind. 2014). An abuse of discretion occurs only when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Hauk v. State*, 729 N.E.2d 994, 1001 (Ind. 2000). Reversal is warranted if the defendant's substantial rights were prejudiced by the trial court's failure to tender the requested instruction to the jury. *Bragg v. State*, 695 N.E.2d 179, 180 (Ind. Ct. App. 1998).

[31] As noted above, the trial court rejected Plumlee's verdict forms that provided "[w]e, the jury do not find that . . . the defendant . . . knowingly or intentionally possessed a . . . Taurus/Ruger handgun. . . ." *Appendix Vol. II* at 104-06. Instead, the trial court's verdict forms to the jury stated "[w]e the jury, find . . . Plumlee . . . did not knowingly or intentionally possess a firearm, to wit: [Ruger/Taurus] handgun. . . ." *Id.* at 127-28.

[32] Plumlee's claim regarding the varying language in the verdict forms amounts to a distinction without a difference when examining them in conjunction with all the jury instructions that were given. Specifically, the record reflects that the jury was properly instructed in accordance with Ind. Code § 35-47-4-5, which provides that a serious violent felon who knowingly or intentionally possesses a firearm commits the offense of unlawful possession of a firearm by a serious violent felon. The jury was also instructed that neither Plumlee's arrest nor the filing of charges were to be considered as evidence of guilt, that it was to consider all preliminary and final instructions together, and that Plumlee's failure to testify could not be held against him. Moreover, the trial court instructed the jury that Plumlee was presumed innocent, that the State had the burden of proof and was required to prove each element of the offense beyond a reasonable doubt, and that if the evidence was susceptible to two reasonable interpretations, it was required to adopt the interpretation consistent with Plumlee's innocence.

[33] When considering all of these instructions in conjunction with the verdict forms, we reject Plumlee's claim that the verdict forms shifted the burden of

proof and negated the presumption of innocence by "requiring the jury to find that [Plumlee] proved his innocence before he could get a not guilty verdict." *Appellant's Brief* at 25.

Judgment affirmed.

Bailey, J. and Crone, J., concur.